1  TRACY L. WILKINSON
   United States Attorney
2  SCOTT M. GARRINGER
   Assistant United States Attorney
3  Chief, Criminal Division
   JONATHAN GALATZAN
4  Assistant United States Attorney
   Chief, Asset Forfeiture Section
5  MAXWELL COLL (Cal. Bar No. 312651)
   Assistant United States Attorney
6  Asset Forfeiture Section
        312 North Spring Street
7       Los Angeles, California 90012
        Telephone: (213) 894-1785
8       Facsimile: (213) 894-0142
        E-mail: Maxwell.Coll@usdoj.gov
9
   Attorneys for Plaintiff
10 UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 8:22-cv-00066 |
| Plaintiff, | VERIFIED COMPLAINT FOR FORFEITURE |
| v. | 18 U.S.C. §§ 981(a)(1)(C) and 984 |
| $309,069.96 IN BANK FUNDS SEIZED FROM CHASE BANK ACCOUNT '2566, $5,731.67 IN BANK FUNDS SEIZED FROM CHASE BANK ACCOUNT '7695, $304.84 IN BANK FUNDS SEIZED FROM CHASE BANK ACCOUNT '6318 AND $250.00 IN BANK FUNDS SEIZED FROM CHASE BANK ACCOUNT '6359, | [FBI] |
| Defendants. | |

Plaintiff United States of America brings this claim against the below-identified defendants, and alleges as follows:

**JURISDICTION AND VENUE**

1. The government brings this in rem forfeiture action pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 984.

2. This Court has jurisdiction over the matter under 28 U.S.C. §§ 1345 and 1355.

3. Venue lies in this district pursuant to 28 U.S.C. § 1395.

**PERSONS AND ENTITIES**

4. The plaintiff in this action is the United States of America.

5. The defendants in this action (collectively, the "Defendant Funds") are the following:

    a. $309,069.96 from Chase Bank account number ending in '2566, (the "Chase '2566 Account")[1] held in the name of BNZ One Capital LLC ("BNZ"), with Brett Reed Barber ("Barber"), Glenn Alan Nitti ("Nitti"), and Louis Zimmerle ("Zimmerle") as signatories and managers;

    b. $5,731.67 from Chase Bank account number ending in '7695 (the "Chase '7695 Account"), held in the name of BNZ, with Barber, Nitti, and Zimmerle as signatories and managers;

    c. $304.84 from Chase Bank account number ending in '6318 (the "Chase '6318 Account"), held in the name of BNZ, with Barber and Zimmerle as signatories and managers; and

    d. $250.00 from Chase Bank account number ending in '6359 (the "Chase '6359 Account"), held in the name of BNZ, with Barber and Zimmerle as signatories and managers.

---

[1] Pursuant to Local Rule 5.2-1, only the last four digits of bank account numbers are set forth in this Complaint.

6. The Defendant Funds were seized on or about August 4, 2021, during the execution of a federal seizure warrant at the Chase Bank retail branch located at 105 E. 17th Street, Costa Mesa, California, 92627.

7. The Defendant Funds are currently in the custody of the United States Marshals Service within this District, where they shall remain subject to this Court's jurisdiction during the pendency of this action.

8. The interests of Barber, Nitti, Zimmerle, and BNZ may be adversely affected by these proceedings.

## BASIS FOR FORFEITURE

*Background on Scheme to Defraud Investors*

9. Beginning no later than in or around May 2019, and continuing to at least October 2021, in Orange County, within this District, Barber devised, participated in, and executed a scheme to defraud individual investors.

10. Specifically, Barber, Zimmerle, and other co-conspirators solicited individual investors to invest with BNZ. Investors were promised guaranteed returns of between 8 percent and 10 percent per year. To make the payments promised to earlier investors, Barber, Zimmerle, and other co-conspirators would solicit new investors. Many of the investors solicited had a preexisting relationship with Barber, Zimmerle, or other co-conspirators through prior investments or insurance contracts that Barber, Zimmerle, or other co-conspirators had sold to the investors.

11. In soliciting investors to BNZ, Barber, Zimmerle, or other co-conspirators would falsely represent that BNZ was in the business

3

of buying and developing real estate projects and flipping real estate, that is, purchasing real estate for below market value and selling it for a higher value. Barber, Zimmerle, or other co-conspirators falsely represented to investors that they would receive a guaranteed rate of return on their investments between 8 percent and 10 percent, which would be paid out monthly, quarterly, or yearly, as well as potential bonuses based on the success of the real estate development projects and sales.

12. Barber represented to investors that the investment was "safe" and "FDIC insured."

13. Barber also failed to disclose to investors that he had previously been barred from acting as or associating with a broker-dealer by the Financial Industry Regulatory Authority ("FINRA").

14. In truth, while BNZ purchased some real estate, it did not actually take any substantial steps toward development of parcels, nor did BNZ flip real estate for a profit. Rather, BNZ primarily used investor funds to (1) pay Barber, Zimmerle, or other co-conspirators; (2) purchase the homes in which Barber and Zimmerle resided; and (3) repay earlier investors with new investor money. Further, the investments were always at risk and never "safe" or "FDIC insured."

15. During the course of the fraudulent scheme, Barber, Zimmerle, or other co-conspirators solicited or caused to be transferred to BNZ approximately $13,800,000 from victim investors.

*Victim Interviews Demonstrate Scope of Fraud*

16. In carrying out its investigation, FBI investigators interviewed several victims of the BNZ scheme.

4

Interview of J.J.

16. FBI special agents interviewed victim J.J.[2] J.J. met Barber because J.J. was a friend of a family member. Barber convinced J.J. to move money from an annuities account to invest in BNZ. Barber stated that the investment was safe, had a guaranteed return of 8 percent to 10 percent annually, and that some of the investments were FDIC insured. J.J. invested approximately $820,000. Barber and Barber's wife also tried to convince J.J. to enter into a reverse mortgage and invest more money in BNZ. J.J. declined.

Interview of E.L.

17. FBI special agents interviewed E.L. of Arizona. E.L. was introduced to Zimmerle through a real estate agent. Zimmerle claimed to be a real estate developer with BNZ and explained that BNZ had real estate projects and real estate deals all over California. E.L. entered into a 1031 real property swap with BNZ in hopes of avoiding significant capital gains taxes from the sale of a house.[3] E.L. partnered with BNZ and purchased undeveloped land in the Sacramento Valley for $1 million. BNZ owned 30 percent of the land, and E.L. owned 70 percent of the land. E.L. received a promissory note paying 8 percent annually with interest payments made monthly. E.L. received monthly updates on the real estate development project from Zimmerle. Zimmerle advised E.L. that four lots were sold for $1

---

[2] Victims are referred to herein by their initials only in order to protect their identity.

[3] A 1031 exchange gets its name from Section 1031 of the U.S. Internal Revenue Code, which allows capital gains taxes to be deferred.

5

million.  No such lots were sold.

<u>Interview of B.J. and A.J.</u>

18.  FBI special agents interviewed B.J. and A.J. of California. Barber had acted as B.J.'s and A.J.'s investment broker for five years.  B.J. had retirement savings in an annuity and another investment.  Barber convinced B.J. to move all of the retirement savings money to BNZ.  Barber stated that the guaranteed annual return rate of 10 percent would be generated by real estate investments, flipping properties, and investment in hedge funds. Barber assured B.J. and A.J. that the investment was safe and that the funds were FDIC insured.  B.J. invested approximately $320,000 with BNZ.  A.J. invested approximately $30,000 with BNZ.  Barber's wife approached A.J. and B.J. about doing a reverse mortgage on their home so they could invest more funds in BNZ.  A.J. and B.J. declined to participate in a reserve mortgage on their home.

<u>Interview of victim L.W.</u>

19.  FBI special agents interviewed L.W. of California.  L.W. invested approximately $400,000 in or around 2008 with Barber.  L.W. met Barber during a meeting regarding the creation of a trust. Barber offered investments to L.W.  Barber had a copy of L.W.'s electronic signature and used that electronic signature to authorize the withdrawal of $180,000 from L.W.'s annuity investment and into BNZ.  L.W. did not know about the investment change and did not authorize it.  L.W's daughter discovered what happened, threatened suit against Barber, and reached a settlement with Barber to have the investment returned.

*The Defendant Funds Are Proceeds of the Fraudulent Scheme*

20. FBI agents reviewed bank records for the four accounts that BNZ maintained at Chase Bank for the period between June 2019 and March 2021. FBI agents discovered that BNZ received and deposited into these four accounts approximately $13.742 million in investor funds from approximately 110 investors.

21. During this time period, BNZ received funds from two sources: investor funds and the sale of one parcel of real estate, which generated approximately $850,000. BNZ originally purchased that parcel of real estate with investor funds. Thus all funds BNZ received, and all funds that were deposited in the four Chase Bank accounts seized, *i.e.* the Defendant Funds, are traceable to receipts from investors. None of the funds represents actual business revenue.

22. Of the funds BNZ collected, BNZ spent approximately $1.78 million on salaries, representing approximately 12 percent of the amount held. BNZ spent an additional $1.8 million on claimed business expenses, including commissions, broker fees, and rent, representing approximately 12.5 percent of the monies received between June 2019 and March 2021. BNZ then used $4.1 million of the funds held in one or more of the four Chase Bank accounts to make interest payments to investors, representing approximately 30 percent of the monies received.

23. Between June 2019 to March 2021, BNZ deposited over $1.1 million of investor funds into the Chase '2566 Account. Barber added funds to this account by transferring $3.6 million from the Chase '7695 Account to the Chase '2566 Account. On the date of seizure, only $309,069.96 remained in the Chase '2566 Account.

7

24. Between June 2019 to March 2021, BNZ deposited over $12.5 million of investor funds into the Chase '7695 Account. On the date of seizure, only $5,731.67 remained in the Chase '7695 Account.

25. Between June 2019 to March 2021, Barber transferred approximately $100,000 from the Chase '7695 Account to the Chase '6318 Account. On the date of seizure, only $304.84 remained in the Chase '6318 Account.

26. Between June 2019 to March 2021, Barber transferred approximately $1.2 million from the Chase '7695 Account to Chase '6359 Account. On the date of seizure, only $250 remained in the Chase '6359 Account.

27. Agents found no evidence that BNZ used any of the funds it received from investors for any hedge-fund investments, as BNZ represented to its investors.

## CLAIM FOR RELIEF

28. Plaintiff incorporates the allegations of paragraphs 1-27 above as though fully set forth herein.

29. Based on the above, plaintiff United States of America alleges that the Defendant Funds represent proceeds traceable to violations of 18 U.S.C. § 1343 (wire fraud). The defendant funds are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C). In addition, to the extent that the Defendant Funds are not the actual monies directly traceable to the illegal activity identified herein, plaintiff United States of America alleges that the Defendant Funds are identical property found in the same account or place as the property involved in the specified offense, rendering the defendant funds subject of forfeiture pursuant to 18 U.S.C. § 984.

WHEREFORE, plaintiff United States of America prays:

    (a)   that due process issue to enforce the forfeiture of the Defendant Funds;

    (b)   that due notice be given to all interested parties to appear and show cause why forfeiture should be not be decreed;

    (c)   that this Court decree forfeiture of the Defendant Funds to the United States of America for disposition according to law; and

    (d)   for such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: January 14, 2022

TRACY L. WILKINSON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
JONATHAN GALATZAN
Assistant United States Attorney
Chief, Asset Forfeiture Section

    */s/ Maxwell Coll*
MAXWELL COLL
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**VERIFICATION**

I, Timothy A. Jacoby II, declare that:

1. I am a Special Agent of the Federal Bureau of Investigation.

2. I have read the above Verified Complaint for Forfeiture and know its contents. It is based upon my own personal knowledge and reports provided to me by other law enforcement agents.

3. Everything contained in the Verified Complaint for Forfeiture is true and correct, to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed January 13, 2022 in Los Angeles, California.

TIMOTHY A. JACOBY II
Special Agent
Federal Bureau of Investigation